STATE OF CONNECTICUT *v.* WILLIAM F. FLYNN

REVIEW DIVISION OF THE SUPERIOR COURT

Decided December 27, 1960

*Harold M. Mulvey* and *Arthur B. O'Keefe, Sr.,* both of New Haven, for the defendant.

*Arthur T Gorman,* assistant state's attorney, for the state.

By THE DIVISION. The defendant, age twenty-eight, pleaded guilty to one count of statutory burglary with violence, one count of theft of cash in the amount of $25,000, three counts of statutory burglary, and one count of theft of cash in the amount of $2200. He received a sentence of not less than five nor more than seven years on the first count and three years on the second count; judgment was suspended indefinitely on the third, fourth, fifth and sixth counts.

On June 6, 1960, police received a report that a department store in the town of Hamden was broken into and that $25,000 in cash as well as some checks were taken from the safe. Entrance was gained by cutting a hole in the roof of the building, and an acetylene torch was used to open the safe. An intensive police investigation followed. This disclosed that the defendant on May 24, 1960, purchased some acetylene and metal-cutting material. The police also found in the home of the defendant a pair of trousers, the leg of which had been partially torn off and which matched the material of part of a trouser leg that was found on the roof of the department store. The investigation further disclosed that the defendant purchased an automobile for which he paid $3750. When he was first questioned, the defendant denied any participation in the crime but later, on June 10, 1960, he made a full confession in which he implicated two others. He also confessed to four other breaks.

It appears that the defendant was gainfully employed until April 29, 1960. In the spring of 1960 he sought the acquaintance of one Ahearn, who had

been released from the state prison at Wethersfield, and with Ahearn embarked on a life of crime. On April 23, 1960, they broke into the Skolnick Furniture Company, where $800 was taken; on May 7, 1960, they broke into the plant of the Pepsi-Cola Company, where liquor and some silver was taken; on May 11, 1960, they broke into the Westville Post Office; on May 16, 1960, they broke into Nyder's Department Store, where $2200 was taken; and on June 6, 1960, they broke into Bradlee's Department Store, where $25,000 in cash and some checks were taken. The burglary at Bradlee's Department Store was carefully planned and executed. The defendant and Ahearn first ascertained that the store was equipped with an ADT alarm system and determined that entrance into it was to be had through the roof. The defendant worked as a maintenance man and presumably had the necessary information and was familiar with the necessary tools to cut the hole. An acetylene torch was necessary to open the safe. The defendant acquired one and practiced cutting metal with it in his cellar until he became proficient in its use. After the burglary, the money was divided between the defendant, Ahearn and a third accomplice. They then went to New York, where the small bills taken were exchanged for bills of higher denomination so that they could not be traced.

It is apparent that the burglaries in which the defendant was involved were deliberate and executed after extensive planning. In imposing sentence the sentencing judge said in part:

"In imposing sentences in these three cases I want to state that the Court notes a great difference between the crime or crimes which I am presently concerned with and most of those which have occupied the attention of the authorities and the Court during this present term. Most of the offenders who come before this Court are people who have succumbed

to temptation due to the frailty of their nature, the hard lot they have had in life, their apparent pressing need momentarily or just then for a small sum of money or for what seemed to them to be the necessity for indulgence in some activity of passion. The Court has to be understanding in those matters, and the appeal of counsel which is always made that justice be tempered with mercy, of course, is well taken and it is right and proper for the Court to exercise discretion in the matter of punishment. Now, in these cases we have what, it seems to me, is quite a different situation. None of these accused are here because at a day and at a time and on an instant they succumbed to a fleeting temptation or suggestion. This offense has been committed by people who really are at war with society. As I have listened to the talk of counsel, both for the State and the accused, and have re-read and have gone along the various comments by the probation officer, it seems to me that this thing has a pattern almost like a military operation, people who were at war with an enemy. Mr. Flynn says, 'I was told that Bradlee's was open. It might be a good score.' I take it that is some colloquial expression. 'We, the two of us, looked it over, then three of us.' So, what do we have here? We have the picking of the victim — and I am now talking about the Bradlee's operation alone — the picking of the victim, the preparation for the attack on Bradlee's, the getting of the automobile, the getting of the acetylene gas, the getting of the burning equipment. We then have training for the operation. Mr. Flynn goes to a cellar and practices cutting on steel items or other hard items to burn until he has established a technique which will help him in this operation. Then they have reconnaissance, just as in the military operation. As Mr. Flynn says, 'One guy drove the car. He dropped us off and picked us up. There was no place to park.' So, assuming that Mr. Ahearn

is the more experienced operator, and he may very well have been the brains of the operation based on his record, we have got the transportation in the hands of Pesticci, the weapon training in the hands of Flynn, and the over-all guidance and help in breaking through the roof in the hands of the experienced Ahearn.

"You see, these three men really were at war with society. And just by what? Just by the merest chance they were caught. Just because some person somewhere remembered, Why, somebody was here about an acetylene torch. Somebody else remembered some other little thing. Just by chance these men were caught and defeated, really, in their operation. Of course, this journey to New York to convert the stolen money into items in that big city which would be difficult to trace is all part of the over-all plan.

"So the Court now has a duty to try, difficult as it may be, to render justice between the State of Connecticut and these men. Not to hold them to too much, but to hold them to enough by way of punishment. Not to inflict any sentence by way of revenge or by any spirit of that type, but to do justice."

In addition to his involvement with the law as a juvenile, the defendant has the following record: December 13, 1953, frequenting a gambling place; September 9, 1955, theft, fined $25; May 6, 1958, drunkenness, fined $10; February 22, 1959, assault on police officer, fined $25.

The defendant claims that the sentence imposed upon him is too severe because it does not properly evaluate the co-operation which he gave to the state in solving the series of crimes in which he and the others were involved, nor does it reflect his own determination to make a clean breast of all of his misdeeds and return to life as a law abiding member of

society. We have examined the facts involved in this application with care and conclude that in the light of the seriousness of the crimes in which the defendant was involved, the extent of his participation in them, and the deliberate manner in which he embarked upon them, the sentences imposed upon him are proper and must stand.

Shapiro, Covello and Healey, Js., participated in this decision.